IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
MONTGOMERY DIVISION

RECEIVED
2007 JUL 30 A 9: 59

[illegible] P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

UNITED STATES OF AMERICA,

    Plaintiff,

v.                            Case No. 2:04-Cr-00084-WHA/CSC

NEAL ROMAN ARMSTRONG,      2:07CV689-WHA

    Defendant.
_____/

**MEMORANDUM OF LAW IN SUPPORT OF ARMSTRONG'S SECTION 2255 MOTION**

    COMES NOW, Neal Roman Armstrong ("Armstrong"), the pro se movant in the above-captioned case, and respectfully files this Memorandum of Law in Support of his Motion to Vacate pursuant to 28 U.S.C. § 2255, which is submitted herewith.

### I. INTRODUCTION

    On May 5, 2004, a federal grand jury for the Middle District of Alabama returned a four-count indictment against Armstrong and Roderick Perkins, charging them with conspiracy to distribute and possession with intent to distribute cocaine (Count 1), distribution of cocaine (Count 2), mailing injurious materials (Count 3), and conspiracy to launder monetary instruments (Count 4). Armstrong was subsequently arrested by federal authorities in the United States Virgin Islands and brought to face the charges in Alabama. Armstrong pleaded not guilty to the charges and proceeded to a jury trial, which

commenced on November 1, and continued through November 3, 2004. The Government voluntarily dismissed Count 3 of the indictment prior to the commencement of testimony at trial. See Trial Tr., Vol. 1, at 15; and Redacted Indictment (Doc. 98).

On November 3, 2004, the jury returned a verdict of guilty on Count 4 of the indictment, but they were unable to reach a unanimous verdict as to Counts 1 and 2. Those counts were dismissed with prejudice. See Trial Tr., Vol. III, at 51-53; United States v. Armstrong, 165 Fed.Appx. 768, 770 (11th Cir. 2006). The Court conducted a sentencing hearing on Count 4 and sentenced Armstrong to serve 109 months in prison and three years on supervised release. See § 2255 Motion at 2; Judgment (Doc. 126).

On February 24, 2005, Armstrong filed a Notice of Appeal to the United States Court of Appeal for the Eleventh Circuit (Doc. 124). On January 31, 2006, the Eleventh Circuit affirmed Armstrong's conviction and sentence on the grounds appealed. See § 2255 Motion at 3; Armstrong, 165 Fed.Appx. at 771-72. Armstrong's petition for a writ of certiorari was denied on October 2, 2006. See Armstrong v. United States, 166 L.Ed.2d 32 (2006); 2006 U.S. LEXIS 5815. Armstrong remains incarcerated in the Federal Bureau of Prisons.

## II. RELEVANT FACTS

### A. The Money Laundering Offense

On May 9, 2003, Wallace Pickett was arrested in Montgomery, Alabama, for taking possession of a package containing 499.5 grams of cocaine that had been mailed to him from the Virgin Islands. Armstrong, 165 Fed.Appx. at 769. On September 5, 2003, Pickett pleaded guilty to possession with intent to distribute cocaine hydrochloride and mailing of poisonous drugs through the mail. He began to cooperate with the prosecution to obtain a reduction of sentence. See Trial Tr., Vol. I, at 130-36. Pickett informed the Government that Armstrong supplied him with cocaine through the mail from the Virgin Islands and that he, "Pickett paid Armstrong for the cocaine by United States Postal Money Orders." Armstrong, 165 Fed.Appx. at 769. "Pickett also informed the authorities that he sometimes directed Roderick Perkins ("Perkins") to purchase the money orders sent to Armstrong " Id.

On May 5, 2004, based upon the information obtained from Pickett, Armstrong and Perkins were indicted. As stated before, Armstrong pleaded not guilty to the charges. Perkins, following Pickett's lead, pleaded guilty and entered into a cooperation agreement with the prosecution to obtain a reduction of sentence. See Trial Tr., Vol. I, at 61, 80, 85, 96 97. Both Pickett and Perkins agreed to testify against Armstrong at his trial. Armstrong, 165 Fed.Appx. at 769.

During the preliminary proceeding above, Armstrong was represented by a CJA panel attorney, Richard K. Keith, appointed by the Court (Doc. 19, 23, 25). On June 18, 2004, Armstrong retained a private attorney, Joseph R. Willie, II, who then

3

motioned the Court for admission and was admitted pro hac vice (Doc. 36, 42), to represent Armstrong. Attorney Keith was thereby allowed to withdraw (Doc. 49). Attorney Willie represented Armstrong during the following proceedings.

1. **The Trial**

Counsel motioned for a directed verdict of acquittal on Count 4 (Doc. 97), arguing that Armstrong never attempted to "conceal or disquise" the nature and/or source of the money orders he received "nor engaged in any activity to avoid a transaction reporting requirement," id. at 1-2. See Trial Tr., Vol. II, at 230-34. The Government pointed out that the indictment charged a conspiracy to promote the carrying on of a "specified unlawful activity." Id. at 236. In denying counsel's motion, the Court enlightened counsel about the proper legal approach to an alleged money laundering conspiracy that is intended to promote the carrying on of a "specified unlawful activity." Id. at 237-38.

Through documents and testimony at trial the government supplied evidence to show that Armstrong received $5,000 by U.S. Postal Money Orders sent from Alabama. It then alleged that the money orders were payment for cocaine Armstrong shipped to Pickett in Alabama. Trial Tr., Vol. II, at 240, 242-45, 254. Pickett testified that he would send $5,000 to Armstrong and waited for a week to receive cocaine in return. Trial Tr., Vol. I, at 110-11. In sending money to pay Armstrong for the cocaine, Pickett testified that he express mailed U.S. Postal

4

Money Orders and sometimes directed Roderick Perkins to purchase the money orders sent to Armstrong. Id. at 112-13.

The following specific questions and answers occurred between the prosecutor and Pickett at trial.

> Q. Other than the shipment of money to Neal Armstrong and the receipt of drugs from Neal Armstrong, was there any other reason for you sending money over to him?
>
> A. No.
>
> Q. Was there any other reason for you asking Roderick Perkins to send money over to Neal Armstrong?
>
> A. No.

Id. at 116.

> Q. . . . [W]hy you were sending the money? What would you have received, if anything?
>
> A. Cocaine.

Id. at 119. See Armstrong, 165 Fed.Appx. at 769 ("Pickett paid Armstrong for the cocaine by United States Postal Money Orders.").

Perkins testified that, when he purchased and mailed the money orders, he was aware that they were being sent to Armstrong "[i]n exchange for cocaine." Trial Tr., Vol. I. at 63. which Armstrong was sending from the Virgin Islands, id. at 63-64. When the cocaine arrived, Perkins stated "[i]t would get picked up and distributed [or s]old . . . [and the] profit . . . would get taken to the bank." Id. at 64. "[W]hen it was time to reorder, it would be withdrawn from the bank, taken to the post office, money orders would be purchased and sent . . . to him

5

[Armstrong]," id., to pay for the cocaine. This testimony was repeated several times. See, e.g., id. at 69:

> Q. Mr. Perkins, do you know how the deal would work between Montgomery and the Virgin Islands in respect to the drugs coming in and the money going out? How would that work?
>
> A. The money would go out before the drugs would be sent off.

Id. at 85:

> Q. Are you telling the truth today?
>
> A. Yes, Ma'am.
>
> Q. Were you involved in a drug-for-money scheme?
>
> A. Yes, ma'am.

Trial Tr., Vol. II, at 199:

> Q. And what was the purpose of the money orders going to the Virgin Islands?
>
> A. To purchase narcotics.

See Armstrong, 165 Fed.Appx. at 769-770 ("When Perkins purchased and mailed the money orders, Perkins was aware the they were being sent to Armstrong as payment for cocaine").

In closing arguments, the prosecutor told the jurors that the inference they should draw from the evidence, in regard to the money laundering offense, is that Pickett gave money orders to "Perkins, who sen[t] them [] to the Virgin Islands to pay for [] a new shipment of cocaine." Trial Tr., Vol. II, at 240, 242. The prosecutor told the jury to "remember" two things: "what Wallace [Pickett] sa[id], 'For the [$]5,000, I get a quarter Key,'" id. 244; and what Armstrong said to Pickett, "'Hey, you send me money; I will send you cocaine.'" Id. at 254.

6

## 2. Posttrial

After the guilty verdict on Count 4 was returned, a presentence investigation (PSI) report was made. The PSI reports that "Pickett paid for the cocaine hydrochloride through United States postal money orders." PSI at ¶ 12. For the purpose of calculating drug amount, the PSI states that, "as evidenced by his [Pickett's] payment to Neal Armstrong on April 15, 2003, in the amount of $5,000 and April 23, 2003, in the amount of $5,000[,] Armstrong is accountable for the distribution of a total amount of 999.5 grams of cocaine hydrochloride." PSI at ¶ 13.

## 3. On Direct Appeal

Counsel "argue[d] that the evidence was insufficient to support a guilty verdict on Count IV . . . [because] the government presented no evidence that [Armstrong] concealed or disguised the nature or source of the money orders he cashed." Armstrong, 165 Fed.Appx. at 771. The Court of Appeals gave counsel another enlightenment regarding his attack on the money laundering conviction under the concealment element of 18 U.S.C. § 1956(a)(1)(B)(i). The Eleventh Circuit stated: "Armstrong was convicted of conspiracy to violate 18 U.S.C. § 1956(a)(1)(A)(i). Concealment is not an element of 18 U.S.C. § 1956(a)(1)(A)(i)." Armstrong, 165 Fed.Appx. at 771 n. 2.

However, the Eleventh Circuit recited, in its background facts, "that Armstrong had supplied Pickett with cocaine on multiple occasions, and that Pickett paid Armstrong for the

7

cocaine by United States Postal Money Orders." Armstrong, 165 Fed.Appx. at 769, 769-770. The Court found that, "[a]t trial, the government presented evidence that . . . Armstrong took the money in exchange for cocaine he shipped to Perkins." Id. at 771.

### B. The Alleged Obstruction of Justice

### 1. The Presentence Investigation Report

Among other recommendations not relevant to this issue, the PSI report recommended a two-level enhancement of Armstrong's sentence for obstruction of justice. It alleged and realleged that:

> On December 12, 2004, Postal Inspector J.D. Tynan interviewed Ervin Johnson, an inmate at the Montgomery City Jail, regrading his knowledge of a proposition made by Neal Armstrong to Johnson, which involved killing a cooperating defendant named Wallace Pickett. Johnson stated that sometime prior to August 2004, he and Neal Armstrong were inmates at the Montgomery City Jail when Armstrong propositioned him about killing Wallace Pickett. Johnson stated that Armstrong was suppose to pay him $500 through Armstrong's girlfriend in the Virgin Islands and ten kilos of cocaine. Johnson advised that shortly after that, he was released from jail before Armstrong paid him any money. Johnson further advised that his bond was revoked and he was placed back in the Montgomery City Jail in federal custody. Johnson advised that Armstrong approach him again about killing Wallace Pickett and made arrangements for a postal money order in the amount of $35 (up front money) to be deposited in Johnson's account at the Montgomery City Jail. Subsequent investigation by investigator Tynan revealed that on **October 4, 2004, a $35 postal money order**, serial number 92588417965 from L. Millin was deposited into Johnson's account at the Montgomery City Jail. The return address on the money order was from St. Croix, U.S. Virgin Islands. Therefore, pursuant to

8

>   USSG § 3C1.1, a two level increase is applicable
>   because the defendant attempted to make arrangements to
>   kill a cooperation witness.

PSI at ¶¶ 15, 22. Armstrong's counsel objected to the PSI's finding of facts, stating that the allegations were "absolutely absurd and have no indicia of veracity, reliability and/or credibility"; and that "[s]uch allegations must be found by a jury beyond a reasonable doubt." Addendum (to the PSI) at ¶ 10. The probation officer responded stating that the government intended to call witnesses at sentencing to substantiate the allegation. Addendum at ¶¶ 12-13.

## 2. The Sentencing Hearing

At sentencing, the government called three witnesses concerning this issue: Johnson, Sentencing Tr. at 17-30; Timothy Sewell, who, likewise Johnson, was a convicted felon and fellow cell-mate of Armstrong, id. at 31-42; and Tynan, id. at 43-45. Johnson and Sewell were jailbirds seeking favors and sentence reduction from the government for their own unrelated crimes. See id. at 18, 28-29, 31.

First to testify was Johnson. He testified that he was supposed to kill "Wallace Pickett and Tim Pickett" [Wallace's brother], id. at 19, for "$500 and ten keys," id. at 20. Johnson stated that Armstrong solicited him "back in June or July 2004," id. at 21, 22, 28, to murder the two brothers. At that time, however, Armstrong knew that Pickett was locked up in another jail. See id. at 28, 48; Affidavit at ¶ . In fact, Johnson said, "he [Armstrong] told me he [Pickett] was locked up

9

. . . when I first came there." Sentencing Tr. at 25. When Johnson was asked: "Do you know where Mr. Pickett was in June or July of 2004?" Id. at 28. He answered: **"I didn't even know Mr. Pickett."** Id. (emphasis added).

Second came the other testifying cell-mate, Sewell. He testified that: Armstrong did not "want to talk to people about his case [because h]is lawyer told him not to." Id. at 33. Sewell "was probably the only person that he [Armstrong] spoke to his case about" (sic). Id. Sewell said of Johnson: "He's -- I guess you would say a violent person. He'll do -- he'll do things for money." Id. at 34. Sewell "conveyed that to Mr. Armstrong." Id. When asked whether he had overheard a particular conversation between "Mr. Armstrong and Mr. Johnson."? Id. Sewell answered: "Yes." Id. at 35. And, as further answer to the question, stated:

> Basically, it was do you know Wallace Pickett, okay? **Yeah, I know Wallace Pickett.** That's -- that's what he asked Irvin Johnson, did he know him and did he know two -- two or three other people. Well -- Wallace Pickett and Tim Pickett. . . . Well, he asked him what did he think about him. And basically, **Irvin said that he didn't like him anyway** and that for the right price, that he would vamoose with him.

Id. at 35 (emphasis added). Sewell stated that Armstrong and Johnson started to negotiate on prices, id. at 36, to kill the Picketts and, "[w]ell the number 500 comes to the game." Id. at 37. Thereafter, the prosecutor asked the following question and received these answers from Sewell:

> Q. All right. While you were aware of this negotiation, are you aware of whether or not money actually exchanged hands?

10

> A. Yes. Mr. Johnson came to me and acknowledged to me that Mr. Armstrong had slipped him some money.
>
> . . . .
>
> Q. Do you know in what form it came?
>
> A. Through the mail. Money order. It wasn't a large increment of money. It was to buy a few things with it, but it was just the fact that he did send him some money. I was like, well, it wasn't no big deal. I didn't look at it as a big deal, because he actually was a nice -- he was a very nice individual, you know, and he gives money to a lot of people, to the less fortunate. He's done it several times. I've seen him do it, [id. at 38], okay? He's came to me and asked me, should I give this person $50 or should I give this person $20. He has done that. So I didn't really think anything of it until Mr. Armstrong -- until Mr. Johnson came to me and started telling me about he's supposed to give me some more money, blah-blah-blah, **because what happened was Mr. Johnson goes home.**

Id. at 38-39 (emphasis added). Sewell further stated that Johnson was released from jail and "**been on the street for like two months,** and now he's back talking about . . . he tried to kill the guy, but the government had him in some type of witness protection program or something like that." Id. at 39. Both Armstrong and Sewell "knew it was a lie," id., Sewell continued: "We knew it was a 100 percent lie; **but he was trying to, I guess you'd say, extort Mr. Armstrong.**" Id. (emphasis added). Sewell and Johnson was not seeing "eye to eye at that particular time," id. at 40, because Johnson was setting up an extortion scheme on Sewell, so they "had an altercation." Id. Regarding Johnson's attempted extortion of Sewell, Sewell stated:

> I had tried to get him to -- I was talking to him about a piece of my case. And when he came back to jail, he goes over to the cell, and he's -- **he was, like, trying to get anybody and everybody to, like, feed him, like he was just so hungry,** you know? I don't know what it

11

> was, but he was, like, hungry when he came back to jail. And he went over to his other cell, even though I had a problem with an individual in another cell, **and he was, like, trying to -- he was going to jump on this individual for me, for me to pay him to --**

Id. (emphasis added). When Johnson's attempted extortion of Sewell failed, Johnson began to extort Armstrong. "Well," Sewell testified, "it gets to the point where **Mr. Johnson threatened him, threatened Mr. Armstrong.**" Id. at 41 (emphasis added):

> "Mr. Armstrong went ahead and agreed, said, yeah, I'll give you $500." You know what I'm saying? I don't know whether he really wanted to give it to him or just like, **'I'll give you $500, whatever,' you know, just to get him out of his face.** Well, Mr. Johnson didn't get that money. So Neal [Armstrong] started sending him little small increments. He [Johnson] wanted it at one time. He wanted all his money at one time. Well, **it get to the point when he started picking on Mr. Armstrong.**

Id. at 41-42 (emphasis added). Sewell ended his testimony here, and to Armstrong's surprise, when the Court called upon defense counsel to cross-examine Sewell, Mr. Willie answered: "No questions, Judge." Id. at 42.

Finally, the government called Tynan to the stand for the fourth time. Notwithstanding his three previous calls to the stand, Tynan was testifying to the obstruction of justice allegation for the first time at sentencing. Id. at 43. Tynan testified that, to corroborate Johnson and Sewell's testimony:

> I obtained the printout from the jail of Mr. Johnson's dates that he was in custody, and I also obtained a receipt for a $35 money order that was deposited into Mr. Johnson's account coming from the Virgin Islands.
>
> . . . .

12

> I believe **it was deposited into his account** on October the . . . 13th of 2004.

Id. at 43-44 (emphasis added). Tynan stated the the $35 money order **"does not"** say for what reason it was sent. Id. at 45.

After the government rested, counsel did not call Armstrong to the stand nor "present any evidence," id. at 46, but he renewed the objections he had made to the PSI. Id. at 48-49.

### ARGUMENT AND AUTHORITY

Armstrong had raised the issues presented in the instant Section 2255 motion in his petition for writ of certiorari. He now adopts the argument there as if argue herein and attaches same here for its argument.

In addition, Armstrong asserts that:

The Sixth Amendment guarantees the right to effective assistance of counsel in criminal prosecutions. See McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)(holding that the Sixth Amendment right to counsel is the right to effective assistance of counsel). Under the Sixth Amendment, defense counsel has a duty to raise potential constitutional claims whether during pretrial, see Kimmelman v. Morrison, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986); trial, Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); or on direct appeal, Evitts v. Lucy, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

In Strickland, the Supreme Court recognized that criminal defendants have a Sixth Amendment right to "reasonably effective" legal assistance and announced the now-familiar test:

A defendant claiming ineffective assistance must show that (1) "counsel's performance was deficient" because it "fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense." 466 U.S. at 687-88; Chandler v. United States, 218 F.3d 1305, 1312-13 (11th Cir. 2000)(en banc). "The same standard applies whether we are examining the performance of counsel at the trial or appellate level." Eagle v. Linahan, 279 F.3d 926, 938 (11th Cir. 2001).

Armstrong asserts that the facts herein, the argument of his certiorari, and the caselaw cited herein and therein, support his contention that a reasonable probability exists that, but for counsel's unprofessional errors and omissions, the result of the proceedings would have been different. See Strickland, 466 U.S. at 689, 694.

Further, Armstrong submits his Declaration in support of both his Section 2255 motion and this Memorandum of Law, as filed herewith.

## CONCLUSION

WHEREFORE, Armstrong prays his Section 2255 be granted.

Respectfully submitted,

This 26th day of July, 2007

Neal Roman Armstrong
#07406-094   (3BU)
FCC Yazoo City Low
P.O. Box 5000
Yazoo City,   MS   39194-5000

14